IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF WYOMING

FILED

2:50 pm, 3/16/11

Tim J. Ellis
Clerk of Court

In re                                    )
                                         )
        DUANE ROBERT KRAFT,              )    Case No.  09-21052
                                         )    Chapter 7
                Debtor.                  )

## OPINION REGARDING THE UNITED STATES TRUSTEE'S MOTION TO DISMISS

This matter came before the court for an evidentiary hearing on November 23,

2010 on the United States Trustee's Motion to Dismiss and the Debtor's objection.  The

United States Trustee ("UST") was represented by Leo Weiss.  Duane Kraft ("Debtor")

was represented by Stephen Winship.  The Debtor did not attend the hearing.  The court

having reviewed the docket, testimony and evidence, grants the motion.

**Jurisdiction**

The Court has jurisdiction of this matter under 28 U.S.C. §§1334(a)[1] & (b); 28

U.S.C. §§157(a) & (b)(1); and 28 U.S.C. §151.  This is a core proceeding under 28 U.S.C.

§157 (b)(A) & (B).

**Background**

The parties stipulated to the following facts.

1.   The Debtor originally filed a Chapter 13 bankruptcy petition on October 19, 2009.
     He voluntarily converted to a chapter 7 on February 10, 2010.

2.   On December 4, 2009, the Debtor filed a proposed chapter 13 plan, to which the

---

[1] Unless otherwise noted, subsequent references are to Title 11 of the United States Code.

standing chapter 13 trustee, Mark Stewart, objected.

3.    The Debtor is an individual with primarily consumer debts.

4.    The Debtor's Chapter 7 Statement of Current Monthly Income and Means Test Calculation (Form B22A), filed on February 24, 2010, indicates that the presumption of abuse does not arise.

5.    Peter Gullicks, Bankruptcy Analyst for the UST, sent a letter to the Debtor dated February 12, 2010. The letter states, that based on the UST's analysis it appeared the presumption of abuse arises and requested information regarding any special circumstances that "might exist to determine whether a declination would be appropriate." The Debtor did not allege any special circumstances.

6.    The §341 Meeting of Creditors (Creditor Meeting) was conducted on March 19, 2010, by Randy Royal, the Chapter 7 Trustee. Michele Hankins, the Assistant United States Trustee[2] attended telephonically.
- The Debtor testified to the following:
  - He originally filed a chapter 13 bankruptcy case as he was "afraid" that his ex-spouse would contest a chapter 7. When his wife filed her own chapter 7 case, and upon an undisclosed agreement with his wife, he converted to a chapter 7 bankruptcy case.
  - He has worked as an Assistant Service Manager for Foss Motors in the service and repair department for approximately 13.5 years. His job is stable. His monthly salary is $1,000.00 per month plus commissions based on the labor sales and hours sold and the service department's sales and profits. The commission ranges between 2.8% to 3.3% and up to 4% of the gross profits. At the time of the creditor meeting, the commission was 2.8%, lower than the Debtor had received in prior years. Debtor also receives a $40-50 a week bonus based on the sale of parts.
  - The Debtor divorced in December 2008.
  - The Debtor has one adult son, 19 years old, living with him. He claims the son as a dependent on his Schedule I and Form 22A. The Debtor's son is in good health; dropped out of school; and according to the Debtor does "nothing...he walks around, sleeps and eats."
  - The Debtor lives in Casper, Wyoming. He surrendered the residence at 1180 South Forest Drive that had a monthly mortgage payment of

---

[2] Ms. Hankins has since retired.

$1,598.00. The Debtor testified that rental rates for apartments in Casper range between $800.00 and $1,000.00 per month at the time of the creditor meeting.

- The Debtor scheduled eight motor vehicles on his Schedule B.
  - (1) A 1988 Ford Van Econoline. The van is titled in the Debtor's name, is paid for in full and used by the Debtor's mother as it has a chair lift.
  - (2) A 1989 Toyota 4Runner. The Toyota is paid for in full. The Debtor gave it to his brother.
  - (3) A 1990 Chevrolet S10 Pickup. The vehicle is paid in full and was given to the Debtor's son. Debtor's name is on the title.
  - (4) A 1994 Toyota Camry. The vehicle is paid for in full; was given to the Debtor's son and now is located in a salvage yard without a motor.
  - (5) A 1994 Toyota T100 pickup truck. The Debtor's stipulated facts indicate that he purchased the truck "three or four years ago." The payments on the truck are $223.00. The Debtor intends to keep the truck and the payments are current.
  - (6) A 2002 Harley Davidson. The monthly payments were $112.00. The creditor of this motorcycle obtained relief from the automatic stay.
  - (7) A 2003 Hyundai Santa Fe. This vehicle was awarded to Debtor's ex-spouse in the divorce. Under the divorce decree, the ex-spouse is responsible for the debt.
  - (8) A 2006 Yamaha Gold motorcycle. The monthly payment is $99.21. The creditor for this motorcycle has obtained relief from the automatic stay.
- The Debtor claimed expenses on his Chapter 7 Form 22A, on the 1996 Toyota, the Harley Davidson, the Hyundai and the 2006 Yamaha.
- The Debtor rents a storage unit to store the following: the Harley, the Yamaha, various household items, three or four NASCAR collectible match box cars, posters, and bicycles, including his son's ten-speed bicycle. The cost per month is $65.00.
- The Debtor has a term life insurance policy that costs $74.76 per month.
- The Debtor has a simple IRA that he makes monthly voluntary contributions in the amount of $174.56. He intends to continue to make the payment.
- Kraft paid $240.00 per month for phone services, including two cell

phones with unlimited texting. One is for his use and the other was
for his son. Cable costs an additional $40.00 per month. The Debtor
testified that he intended to drop one cell phone in June 2010, which
will save him $113.00 per month.

• The Debtor is 38 years old and in good health. No calamitous
circumstances precipitated the filing for bankruptcy.

## Discussion

The UST argues that the Debtor's bankruptcy case should be dismissed under

§§707(b)(1) and (2) alleging that after proper application of the income and expenses of

§707(b)(2), the presumption of abuse arises and the case should be dismissed, or in the

alternative, under §§707(b)(1) & (3) alleging that under the totality of the circumstances

of the Debtor's financial situation, the Debtor has an ability to pay and granting relief

would be an abuse of the bankruptcy code. The Debtor responded that §707(b) does not

apply to cases that were filed under Chapter 13 and then later converted to a Chapter 7.

This case has had a long and convoluted history. As stated, the Debtor initially

filed for chapter 13 bankruptcy relief and subsequently converted to a chapter 7 case. The

Debtor filed a Motion to Dismiss the United States Trustee's Motion to Dismiss which

was heard by the court. The Order Denying Debtor's Motion to Dismiss the United States

Trustee's Motion to Dismiss ("Motion Order") was entered on August 13, 2010. The

court held that the Debtor was required to complete a chapter 7 means test upon

conversion from a chapter 13. The Debtor appealed to the Bankruptcy Appellate Panel

("BAP"), but the appeal was dismissed as the BAP determined that the Motion Order was

not a final order. Additionally, the Debtor requested that he be allowed to appeal the

issue directly to the Tenth Circuit Court of Appeals. That request was denied.

## Dismissal under §707(b)(1)( and (2)

The court may dismiss a case filed by an individual debtor, whose debts are

primarily consumer debts, if it finds that the granting of relief would be an abuse of the

provisions of Chapter 7.[3] In considering whether granting relief would be an abuse, the

court shall presume abuse exists if the debtor's current monthly income[4] reduced by

certain monthly expenses; multiplied by 60 is not less than the lesser of: 25 percent of the

debtor's nonpriority unsecured claims in the case, or \$6,575, whichever is greater, or

\$10,950.[5] These expenses include: the applicable monthly expenses for the debtor,

spouse and dependants; the actual monthly expenses for the debtor, spouse and

dependants; reasonably necessary expenses incurred to maintain the safety of the debtor

and the debtor's family from family violence; reasonably necessary expenses for health

insurance, disability insurance, and health savings account expenditures for the debtor,

spouse and dependants; and, debtor's average monthly payments on secured debts and

priority claims.[6]

---

[3]11 U.S.C. § 707(b)(1).

[4]Current monthly income is defined as the average monthly income from all sources that
the debtor receives, derived during the 60-month period ending on the last day of the calendar
month immediately preceding the date of the commencement of the case. 11 U.S.C. § 101(10A).

[5]11 U.S.C. § 707(b)(2)(A)(i)(I) & (II).

[6]11 U.S.C. § 707(b)(2)(A) (ii), (iii) & (iv).

Page 5

Household size

As stated previously by this court,

"The purpose of the § 707(b)(2) means test is to ensure that debtors repay creditors the maximum that they can afford. To determine if debtors have sufficient disposable income to repay creditors, debtors' allowable expenses are deducted from current monthly income. Debtors apply standards based upon the household size to get deductions. The Bankruptcy Code limits the debtor's monthly expenses to those of the debtor, debtor's spouse and debtor's dependents. Larger households or those with more "dependents" subtract a greater amount of expenses from the current monthly income resulting in a lesser payment to unsecured creditors.[7] However, "dependent" is not defined in the Code."[8]

This court has adopted the "dependant" approach to determine a household size which requires a case-by-case determination by the court.[9] In the "dependant" approach, the debtor must have reasons to provide support for a dependant and the claimed dependant must have a reason to rely on the debtor. The court considers the following factors to determine if the dependant should be included in the household size: (1) the length of time the claimed dependant resided in the household; (2) the reason the claimed dependant resides in the household; (3) the age of the alleged dependant; (4) how much income or support the dependant receives from a third party; (5) whether the dependant is in school; and, (6) whether the dependant could be claimed as an IRS deduction or qualify in another

---

[7] 11 U.S.C. §707(b)(2)(A)(ii)(I).

[8] *In re Heinze*, Case No. 10-20455 (Bankr. D. Wyo., Jan. 12, 2011).

[9] *In re Dunbar*, 99 B.R. 320 (Bankr. M.D. La. 1989).

Page 6

legal way, i.e. for purposes of medical insurance.[10]

In this case, the Debtor, through the stipulated facts, asserted that his adult son who is living with him, is not going to school; is not working but is capable of working, but does not appears to have any incentive to gain employment, should be claimed as a dependant in the household for the purpose of the means test calculations. The Debtor claims the adult child as a dependent on his federal tax return. The adult child is not contributing to the household income, but seems to substantially impact the Debtor's expenses. As much as this court empathizes with a parent's desire to support an adult child, and under some circumstances it would be appropriate, this Debtor's creditors should not have to bear the burden of Debtor's son's expenses. The court finds that the Debtor's household size should be considered as a household of one.

As this court held in *Steinberg*,[11] the chapter 7 means test is a snapshot, a backward looking test, which is designed to measure the debtor's financial health at the time of the filing. A court is not required to look at "projected" amounts due to secured creditors in the future. Post-petition events are better addressed by the totality of the circumstances test under §707(b)(3), where the Court considers whether the debtor filed the petition in bad faith or whether the totality of the

---

[10] *Dunbar, supra.*

[11] *In re Steinberg*, Case No. 09-20988, 2010 Bankr. LEXIS 4001 (Bankr. Wyo., Oct. 8, 2010).

circumstances of the debtor's financial situation demonstrates abuse.[12]

The Debtor states on his Schedule I, that his income is $6,299.00 per
month. By the court's calculation, the Debtor's annual total income is $76,568.00.
A household size of one, in the state of Wyoming, for the filing period of March
15, 2009 through October 31, 2009, inclusive, is $46,265.00.[13] It is obvious to the
court that the Debtor is an over-median income debtor and required to complete
the expense portion of Form 22A. The modification from a household size of two
to one significantly impact the calculations of Form 22A. It is difficult for the
court to determine if the presumption of abuse arises under §707(b)(1) and (b)(2)
in this case because the entire Form 22A, must be recalculated. The evidence that
was presented does not assist the court in determining if the presumption of abuse
has arisen. The assumptions and calculations are: (1) not based upon the proper
household size nor account for the "snap-shot" approach of the Chapter 7 means
test. This court is not going to presume what any of the calculations of the Form
22A means test will be, and will not rule on whether the presumption of abuse has
arisen in determining whether this case should be dismissed at this time.

## Dismissal under §707(b)(1) and (3)

Alternately, the UST asserts that the Debtor's bankruptcy case should be

---

[12] *Steinberg* at 7.

[13] Obtained from the UST Program means testing web site for the Median Family Income based on
State/Territory and Family Size.

Page 8

dismissed under the totality of the circumstances test.  That test provides that in

determining whether granting relief would be an abuse of the provisions of the

bankruptcy code, in which the presumption does not arise or is rebutted, the court

shall consider (a) whether the debtor filed the petition in bad faith; or, (b) if the

totality of the circumstances of the debtor's financial situation demonstrates

abuse.[14]

In this case for the analysis under the totality of the debtor's financial

circumstances, the court assumes, without ruling on the issue, that the presumption

of abuse, either did not arise or was rebutted.

This issue has been before the court in the case of *In re Kreiling*.[15]  In that

case the court adopted the factors for the court to consider when analyzing the

debtor's financial circumstances for abuse as established in *Daugherty*.[16]  The

three sets of factors are:

(1)     The circumstances surrounding the debtor's finances, which include
        the debtor's ability to pay creditors; whether the debtor's budget is
        excessive; whether the debtor has reaffirmed a large amount of
        secured debt; whether the debtor has a stable income; whether there
        were incurrences of cash advances or excessive consumer purchases.

(2)     Debtor's truthfulness on his schedules accurately reflecting the
        debtor's true financial circumstances and whether the debtor filed in

---

[14] 11 U.S.C §707(b)(1) and (3).

[15] *In re Kreiling*, Case No. 09-21000, 2010 Bankr. LEXIS 1414 (Bankr. Wyo. April 26, 2010).

[16] *In re Daugherty*, 416 B.R. 582, Bankr. D. Tex., 2009).

good faith.

(3)     Other factors to consider would be the reason or need for filing; was
        there an illness, calamity, disability or unemployment that
        precipitated the filing and whether the debtor could have negotiated
        with creditors outside of bankruptcy.

The Debtor stipulated that he is an individual with primarily consumer

debts. He has been employed at Foss Motors for over thirteen years. He is in good

health and does not report any calamitous circumstances that precipitated his filing

for bankruptcy. Debtor's Schedule I and Form 22A reflects that the Debtor lists

his monthly income at $6,299.00 per month. Debtor's own Schedules I and J,

reflect that he had $461.75 a month net income in his budget. This does not take

into account that relief from stay was granted to First Interstate Bank, WyHy

Federal Credit Union and American General. The Debtor stipulated that rental

costs are between $800.00 and $1,000.00 per month in the area that he lives. Upon

relief from stay for First Interstate Bank, this would result in an additional amount

of $598.00 a month disposable income from the reduction of his mortgage

payment to the higher rental amount. The resulting surrender of the home also

eliminates the need to pay real estate taxes and insurance, which the debtor lists in

the total amount of $240.00 in his Schedule J. Additionally, after the order

granting relief from stay to American General and WyHy Federal Credit Union,

the Debtor has an additional $212.00 disposable income. The Debtor stipulated

that his cable costs $40.00, whereas his Schedule J lists the expenditure in the

amount of $80.00. The Debtor also stipulated that his voluntary reduction from
two cell phones to one would reduce that expense by $113.00 per month. These
reductions in expenses alone, total an additional $1,230.00 available for
distribution to creditors.

The court's review of the case docket does not reflect that the Debtor has
reaffirmed any debt. He has a stable income. There are no allegations that he
incurred cash advances or excessive consumer purchases.

The Debtor did assert that he had originally filed a chapter 13 as he was
"afraid" his ex-spouse would contest a chapter 7. Upon an undisclosed agreement
with his ex-spouse, the Debtor then converted to a chapter 7 case. While in
chapter 13, the Debtor filed a proposed plan, to which the Trustee objected, on the
grounds that the Debtor did not propose to pay all his disposable income into the
plan for payment to his non-priority unsecured creditors, alleging numerous
improper deductions on Debtor's Form 22C. Without a final hearing on those
issues, Debtor's own proposed plan allowed for a plan payment of $460.00 a
month for an applicable commitment period of 60 months resulting in a
distribution to unsecured creditors of approximately 41%. The court's review of
Debtor's Form 22C is not helpful. The household size is based on a household of
two. This court has determined that the Debtor's household size is one. He also
claims deductions for an additional vehicle ownership expense; mortgage payment

Page 11

for a surrendered residence, housing and utilities adjustment, a transportation expense for an additional vehicle, payments for to motorcycles that were surrendered or relief from stay was granted to the creditors. These are issues that discredit the validity of the Debtor's calculations on Form 22C. The court, in using only the reduction of expenses as stated above, estimates that the Debtor may have the ability to pay $1,188.00 per month to non-priority unsecured creditors.[17]

The standard for granting a motion to dismiss under 707(b)(3) is "abuse." The Debtor filed for chapter 13 bankruptcy protection after a divorce. Subsequently, after some agreement with his ex-spouse, he converted his case to a chapter 7. The Debtor earns a good, steady income. Even a cursory review of his budget, projected forward, shows that the Debtor has substantial disposable income to pay his creditors.

The Bankruptcy Code underwent a major reform with the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. The policy underlying that reform was intended to ensure that debtors repay creditors the maximum they can afford. The court finds that to allow this Debtor to continue in a chapter 7 would constitute an abuse of the Bankruptcy Code within the meaning of §707(b)(3).

---

[17] The court calculated from the Debtor's own Form 22C, showing a monthly disposable income of negative $42.49 adjusted by $1,230.00 to reflect an estimated projected monthly disposable income of $1,188.00 (rounded).

Page 12

This opinion constitutes the Court's findings of fact and conclusions of law.

A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021. The Debtor

will be allowed a short time in which to voluntarily convert to a Chapter 13 or 11.

DATED this ___16___ day of March 2011

By the Court

HONORABLE PETER J. MCNIFF
United States Bankruptcy Judge

Service to:
    Stephen Winship
    Leo Weiss